UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,        ) Case No.
                                 ) 08-20015-Cr-COOKE
               Plaintiff,        )
                                 )
        -v-                      )
                                 )
OCTAVIO DELEMOS and              )
RUDDY PEREZ-ESPINAL,             )
                                 ) Miami, Florida
               Defendants.       ) March 3, 2010
                                 ) 10:30 a.m.

Pages 1-42

TRANSCRIPT OF SENTENCING PROCEEDINGS

BEFORE THE HONORABLE MARCIA G. COOKE

U.S. DISTRICT JUDGE

APPEARANCES:

For the Government          H. RON DAVIDSON
                            Assistant U.S. Attorney
                            99 Northeast 4th Street
                            Miami, Florida  33132

For Defendant Delemos       BARZEE FLORES PA
                            BY:  HECTOR L. FLORES, ESQ.
                            169 East Flagler Street - Suite 1200
                            Miami, Florida  33133
                                     -and-
                            JOAQUIN G. PEREZ, ESQ.
                            6780 Coral Way
                            Miami, Florida  33155

For Defendant               PERCY MARTINEZ, ESQ.
Perez-Espinal               2 Alhambra Plaza
                            Coral Gables, Florida  33134

Reported by:                WILLIAM G. ROMANISHIN, RMR, CRR
(305) 523-5558              Official Court Reporter
                            400 North Miami Avenue
                            Miami, Florida  33128

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

2

```
 1              (Call to order of the Court)

 2              (Interpreters present)

 3              THE COURTROOM DEPUTY:  Judge, we have our sentencing

 4    this morning in USA versus Octavio Delemos and Ruddy

 5    Perez-Espinal, case number 08-20015.

 6              THE COURT:  Appearing on behalf of the United

 7    States.

 8              MR. DAVIDSON:  Good morning, Your Honor.  Ron

 9    Davidson on behalf of the United States.  With me is Fred

10    Fernandez from the United States Secret Service.

11              THE COURT:  Appearing on behalf of Octavio Delemos.

12              MR. FLORES:  Hector Flores and Joaquin Perez, Your

13    Honor.

14              THE COURT:  And appearing on behalf of Rudy

15    Perez-Espinal.

16              MR. MARTINEZ:  Good morning, Your Honor.  Percy

17    Martinez on his behalf.

18              THE COURT:  The spectators may be seated.

19              I am going to, obviously, sentence the defendants

20    separately.  But, Mr. Davidson, don't sit down.

21              My question is related to a very particular legal

22    point in the presentence report that I think the Government is

23    disagreeing with Probation's recommendation in regard to the

24    sentence in this matter for both defendants, correct?

25              MR. DAVIDSON:  That is correct, Your Honor.
```

3

1    THE COURT:  And I'd like to hear what your argument

2  is on that issue for the record.

3    MR. DAVIDSON:  Certainly, Your Honor.

4    The Government is seeking a six-level enhancement

5  because there were over 250 victims in this case.

6    The evidence established that the defendants

7  possessed on their computer approximately 3,000 credit card

8  numbers, over 3,000 credit card numbers.

9    THE COURT:  But I don't think either defendant's

10  counsel disagrees with that.

11    The question is which guideline book applies, because

12  this offense occurred in 2008, I believe.

13    MR. DAVIDSON:  '07.  Correct.

14    THE COURT:  2007, and was supposed to go to trial in

15  2008.  So those were the guidelines that would have been in

16  effect at the time.

17    When the defendants left -- let's use that word

18  generously -- since they left and came back, a new guideline

19  came in.  So, this is really not a disagreement about the

20  facts.  It's a disagreement about the application of a

21  particular guideline in the book.

22    MR. DAVIDSON:  That's correct, Your Honor.

23    The department's position is that the guidelines are

24  now advisory, and because they're advisory, there is no ex

25  post facto violation in the Court using the new book.

4

1          The new book incorporates the suggestions of the

2     Sentencing Commission and incorporates the newest data, the

3     newest research, and because of all those benefits, the

4     department's position is that the Court should use the new

5     guidelines.

6          There is no ex post facto violation because it is not

7     a law.  The law hasn't changed; merely, the advice of the

8     Sentencing Commission has changed.

9          It is an open question in the Eleventh Circuit.  Many

10    circuits have held that the guidelines are not law for

11    purposes of ex post facto and, therefore, the Court should be

12    using the new guidelines.

13         Under the new guidelines, it is clear that the

14    victims of the fraud, over 3,000 people, are victims and,

15    therefore, the six-level enhancement applies.

16         THE COURT:  Mr. Davidson, I can understand the

17    position when you say the guidelines are advisory.  But is it

18    not the department's and your office's practice to object to

19    any sentence outside the advisory guideline range?  Usually.

20         MR. DAVIDSON:  Generally, yes.  We believe that the

21    sentences should be within the guideline range, yes, because

22    the guidelines incorporate the 3553 factors.  They ensure

23    equality across sentences and that's why the department

24    believes in the guidelines.

25         The question here is which guideline to use and

1    because --

2            THE COURT:  I understand that.  But your argument is

3    that by virtue of the benefit of the advisory nature of the

4    sentencing guidelines, that that now means because the Court

5    is not bound by it, you don't have an ex post facto effect.

6            MR. DAVIDSON:  Exactly, Your Honor.

7            THE COURT:  But, in essence, the department treats

8    the guidelines as law and opposes any sentence outside the

9    advisory guideline range.

10           So, are you not, to borrow from the vernacular,

11   trying to have your cake and eat it too?

12           MR. DAVIDSON:  I think the department's position,

13   Your Honor, is that the defense bar should not have its cake

14   and eat it too also.  The defense argues that the guidelines

15   should be advisory and the Supreme Court adopted that

16   position.

17           And if that's the new legal regime that we're living

18   in, where the guidelines are advisory under Booker, and that's

19   what the Supreme Court has held, then let's be consistent.  If

20   they're advisory for purposes of sentencing, then they should

21   be advisory for the purposes of the ex post facto clause as

22   well.

23           I think the department is trying to be consistent in

24   saying, if they're advisory in one context, they should be

25   advisory in the ex post facto as well.

6

1          THE COURT:  If they're advisory in one context, why

2   do you always oppose a sentence outside the advisory guideline

3   range if we're talking about 3553 factors and the ability of

4   the judge to use certain discretion at sentence?  Just think

5   about that for a moment.

6          MR. DAVIDSON:  Sure.

7          THE COURT:  All right.  For Mr. Perez-Espinal, your

8   argument on this issue, Mr. Martinez.

9          MR. MARTINEZ:  Judge, my argument on the issue is

10  that ex post facto is the law of the land and that there's a

11  number of cases out of the Eleventh, although they haven't

12  addressed it since Booker, but there's a number of cases out

13  of the Eleventh and other circuits and the Supreme Court of

14  the United States that address this issue in dicta and said

15  you apply the guidelines that are most favorable to the

16  defendant and you apply the guidelines that are applicable to

17  the time when the defendant committed the offense.

18         Here we know the defendants were arrested in December

19  2007.  So, for the Government now to say, well, the law has

20  changed and it's in our favor and we can now increase their

21  points by six because of this change in the law and that

22  somehow these guidelines are not law, I think that's

23  completely misplaced and I think it's disingenuous.

24         For some arguments, they come in here and they say,

25  well, these guidelines are laws, and now this morning they're

1    saying no, the guidelines are not laws.

2           Our position is that the department is correct that

3    the ex post facto laws apply and that the 2008 guidelines

4    apply in this case.

5           Apart from that, with regard to the computer and

6    those numbers in the computer, we're taking exception to -- at

7    least I am on behalf of my client -- that those numbers are

8    even applicable to my client.

9           My position is, Judge, that those numbers are not

10   applicable to my client.  That computer was not my client's.

11   That computer was not Octavio Delemos' either.  And it's not

12   disputed by the Government that that computer belonged to

13   Dalmau, Alfredo Dalmau, the fellow who is long gone and --

14           THE COURT:  The one guy who isn't here today, right?

15           MR. MARTINEZ:  They can't seem to find him.

16           But it's not disputed that that computer was his and

17   that he's the fellow who would buy these numbers, store them

18   and control them; and my client and Octavio had no knowledge

19   of the presence of those numbers in that computer and they had

20   no knowledge of where those numbers came from.

21           Alfredo Dalmau is the one who controlled those

22   numbers.  He's the one that would send my client to the store

23   to make purchases and give him the credit card.  Never did my

24   client have any idea of where to buy these numbers -- and he

25   was fully debriefed on this issue -- nor did he know that

1    those numbers were being kept in that computer.

2            We're telling the Court this morning that my client

3    has been debriefed and he admitted I was involved in this

4    conspiracy.  He gave a full debriefing.  He said my loss, and

5    he gave a rough estimate.  He says it's somewhere under

6    $200,000.

7            Interestingly enough, the information that the

8    Government gives to Probation is that the only numbers that

9    they could attribute to my client is $171,000 of loss, which

10   were the actual credit cards that were found in the house;

11   that these other numbers that were in the computer actually

12   were likely sold to parties that had nothing to do with the

13   conspiracy, and those folks very likely used those numbers.

14           THE COURT:  Isn't that the conspiracy?  You don't

15   have to know everything that's going on.  You don't have to be

16   a part of each and every act.  You just got to be there and do

17   your overt acts.  You're responsible for all of the relevant

18   conduct as part of the conspiracy.  You don't get to pick and

19   choose the good parts.

20           MR. MARTINEZ:  That's true, Judge.

21           But the issue is whether it was foreseeable for my

22   client to know that there were over 3,000 numbers inside of a

23   computer that didn't belong to him.

24           All he knew was that there were 10 or 15 credit cards

25   that had been made, some of which had been given to him that

1    he utilized.  He didn't know the extent of this conspiracy.

2    He didn't know the extent of the numbers that were inside of

3    that computer.

4         THE COURT:  But even the jury instruction on

5    conspiracy says you do not have to know the extent of the

6    conspiracy or even all of the reasonably foreseeable aspects

7    of it.

8         If I were giving an instruction to a jury on this

9    case had it gone to trial, all of these things would have been

10   admissible against your client.  He can't just separate

11   himself out now and say, whoops, sorry, I didn't mean those

12   other 2,900 numbers.  I only had my 100 numbers.

13        MR. MARTINEZ:  The point is, Judge, that there's no

14   evidence -- he didn't know about it.  He's been debriefed on

15   this issue and there's no evidence that he had any knowledge

16   of these numbers.  And the most telling paragraphs of the PSI

17   are paragraphs 14, 15 and 16.

18        In paragraph 14, Judge, the Government tells

19   Probation that the defendant's involvement in the overall

20   transaction is not discernible at this time.  A total of 3,453

21   account numbers were found on the computer at the residence.

22        However, as to these accounts, the Government

23   indicated that much of the fraudulent charges made were also

24   done by individuals to whom the defendants either may have

25   provided access numbers to or may have received the same

1    compromised numbers from parties other than the defendants in

2    this case.

3            THE COURT:  So you're disagreeing with paragraph 23

4    of the report.

5            MR. MARTINEZ:  Yes, I am, Judge.

6            Our position is that the loss should be $171,562,

7    which was the actual loss, which is the only amount that the

8    Government has any proof that my client was genuinely involved

9    in.

10           They're telling Probation, these numbers that are

11   there, we can't tell you if there was a dollar loss

12   attributable to these defendants or if it was $500.  They

13   can't even tell Probation what loss there was or if they were

14   even ever used by the defendants.

15           And our position is that the loss amount should be

16   $171,562, which is a loss on those 15 credit cards that were

17   found, the American Express and Discover cards, that were

18   found in the residence at the time that they were arrested.

19           THE COURT:  Let me hear from Mr. Flores on this

20   issue.

21           MR. FLORES:  Your Honor, we'd adopt Mr. Martinez's

22   remarks and only note that Mr. Delemos is even more tenuously

23   involved in the case and connected to the computer.

24           I think the Government would agree, based on the

25   debriefings, that Mr. Delemos didn't know of the existence of

 1    the computer, therefore, didn't know of the existence of the

 2    3,000-plus numbers.

 3            THE COURT:  Weren't they all three living in the same

 4    house?

 5            MR. DAVIDSON:  Correct, Your Honor.

 6            MR. FLORES:  Yes, Your Honor.

 7            Mr. Dalmau arrived -- was not living there.  He was a

 8    guest for a more limited period of time.  And Mr. Delemos had

 9    recently returned from the Dominican Republic shortly, like

10    within a week of the arrests on December 11th.

11            MR. DAVIDSON:  Your Honor, if I may respond.

12            THE COURT:  Mr. Davidson, yes.

13            MR. DAVIDSON:  Thank you, Your Honor.

14            This is similar to an orchestra where all three

15    defendants played their unique roles.

16            Mr. Delemos played the role of providing the

17    housing.  It was his father's house.  He invited the

18    codefendants into the house, and in the end he had a fake ID

19    and a fake credit card of his own.

20            Ruddy Perez-Espinal played the role of the

21    purchaser.  He would take the credit cards, go out and make

22    purchases.

23            And it seems that Dalmau was also a purchaser, but he

24    had access to all of the credit card numbers.

25            So, each one of the three defendants place their own

1   role, and I think the Court was correct when it analogized it

2   to the traditional conspiracy.  If you join for part of it,

3   you're responsible for all of it.

4           And I would note Delemos and Perez-Espinal knew that

5   Dalmau was involved in credit card fraud.  All of them knew

6   that that was his job, was stealing people's credit card

7   numbers.  And, so, they knowingly join this conspiracy knowing

8   that the numbers had to come from somewhere.

9           And, so, it's not beyond expectation that the person

10  who's involved in credit card fraud would have stolen credit

11  card numbers.  That's imminently expectable.

12          Finally, Your Honor, I would also note that

13  Mr. Martinez talked about the loss amount, and I would note

14  that they are already receiving a tremendous concession here.

15  Discover alone recorded $4.5 million in fraudulent

16  transactions.

17          Now, we don't know what was going on behind the

18  scenes.  All we know is what the Secret Service and DEA and

19  law enforcement observed in December '07, when they went

20  inside.  What was going on behind the scenes is difficult for

21  us to ascertain.  We don't know who used which credit card on

22  what day.  That's information that the defendants have.

23          But we know that $4.5 million of purchases were made

24  somewhere, possibly by the defendants, and we're giving them a

25  concession by only asking for a $1.5 million loss.  And it

1    seems excessive, I think, for Mr. Martinez, having received a

2    $3 million concession, now to ask for an additional million

3    dollar concession.

4         The guidelines require $500 in loss per credit card

5    possessed.  Here they possessed over 3,000 credit card

6    numbers.  Times that by 500, we get a clean simple

7    $1.5 million.  The loss could have been higher had we been

8    able to attributable the $4 million in purchases to them.

9         I think that, you know, Probation and I were both

10   giving the defendants a benefit by going for $1.5 million, and

11   I'm a bit surprised that he was asking for even more.

12        THE COURT:  All right.  I'm going to resolve the ex

13   post facto issue first.

14        I agree with the calculation as made by the probation

15   officer.  The appropriate guideline calculation or book to

16   apply is the calculation at the time of the offense, or if

17   it's some change, the one that is of benefit to the

18   defendant.  That's the guidance that we're given through the

19   manuals.  There could even be a change that's later that could

20   benefit the defendant.

21        But in this case, the ones that were in effect at the

22   time that the offense was committed that was known in the

23   universe, for lack of a better word -- I'm not going to say

24   known to the defendants, because I don't see any reason why

25   they would have known about the guideline manual -- are the

1  ones that would be applicable here.

2       The next issue is the issue as to the amount.  Both

3  counsel for both defendants disagree with the paragraph in

4  their respective defendant's report that give the 16-point

5  enhancement for the loss of $1,910,621.04.

6       I believe, given the known universe, that's the

7  correct one.  This was a conspiracy.  You don't have to know

8  what everybody else is doing.  In for a penny, in for a pound,

9  and that's what was going on here.  So I believe that that is

10  the correct one there.

11       Now, is there any other disagreement as to the

12  calculation of the guideline range for the defendants?

13       Mr. Martinez, anything on behalf of your client?

14       MR. MARTINEZ:  Judge, I'm objecting to the fact that

15  no role was given.  I believe that he's entitled to minor

16  role, and the reason is that, again, Alfredo Dalmau, he was a

17  leader.  He was a fellow who directed my client to go to the

18  store; gave him the credit card; bought the numbers from a

19  third party; and he's the one that organized this whole

20  thing.  It wasn't my client, and I think that's undisputed,

21  and the Government understands that.

22       I mean, their argument is that everybody had their

23  role like an orchestra.  But unlike an orchestra that's making

24  music, we're addressing laws here of the Government, and the

25  laws provide that my client, if he had a lesser role than

1   somebody else, he's entitled to minor role.

2           And my position is that my client, he was unaware of

3   the existence of these numbers on the computer.  All he knew

4   was the cards that Dalmau would make and would give to him, he

5   would go to Best Buy or whatever store, Wal-Mart, and make the

6   purchases.  Those items would be sold and they would generate

7   some money.  At the end of the day, my client probably made,

8   you know, five cents on the dollar, if that much.

9           My client is going to be debriefed fully, once again,

10  on all this.  He never knew where these numbers came from.  He

11  never had dealings with the fellow who sold these numbers.  He

12  never controlled the numbers.  He never gave these credit

13  cards to other folks to make purchases.

14          His sole function here was that of a worker.  He was

15  lower management -- not lower management, but he was the

16  worker.  Alfredo Dalmau was management.  He's the fellow who's

17  telling him what to do and how to do it and providing him with

18  the wherewithal to do it.

19          Interestingly enough, he's the fellow who's not

20  before the Court today and my client is.  I guess that's

21  telling to some degree as to, you know, who's the snake in the

22  grass here.

23          But, Judge, that's our position.  Our position is

24  that my client -- it's undisputed that it was Dalmau's

25  computer.

1          If you look at the plea colloquy that I had the court

2     reporter -- he graciously pulled it up for us -- on page 11,

3     the Government in his factual proffer, he says, this computer

4     belonged to codefendant Dalmau.

5          I've got some downloads from the computer that

6     specifically show photos and pictures of marijuana and

7     computer stuff.  And even on the computer, the path says

8     Alfredo Dalmau.  He had his name all over the computer.

9          THE COURT:  Mr. Flores.

10         MR. FLORES:  Your Honor, we have likewise objected to

11    the presentence investigation report's conclusion about role

12    in the offense.

13         Mr. Delemos's participation in this case was

14    basically limited to allowing these guys to stay in his house

15    knowing that they were committing credit card fraud.  Although

16    he possessed one false credit card and one false ID, he never

17    used them.  He didn't know anywhere near the extent of

18    Dalmau's fraudulent credit card enterprise.

19         Based on those facts, which I think they're agreed,

20    they're part of the debriefings of both Mr. Perez-Espinal and

21    Mr. Delemos, we believe he's entitled to consideration as a

22    minimal participant in this offense.

23         MR. DAVIDSON:  Your Honor, may I respond?

24         MR. MARTINEZ:  Judge, if I can just briefly address

25    that.

1          THE COURT:  Briefly, and then Mr. Davidson, very

2     briefly.

3          MR. MARTINEZ:  Judge, with regard to Ocatvio Delemos,

4     I'm not an advocate for him.  I'm not his lawyer, but I did

5     represent him at the time and I was present when my client was

6     debriefed on the issue of Octavio Delemos.

7          My client did in fact explain to the Government that

8     he wasn't involved in the conspiracy; that, sure, he was paid

9     rent to be allowed to live there and he had some general

10    knowledge of Alfredo Dalmau's involvement in credit card

11    conspiracy.  But Alfredo Dalmau did not live in that home.  He

12    never rented a room in that home.  He just happened to

13    actually stay there one night, and that was the extent of it.

14         But my client did tell the Government that Octavio,

15    he wasn't part of this conspiracy.  He never gave him a credit

16    card.  He never gave him any benefit from the credit card

17    conspiracy.  He was just the guy who everybody would go to his

18    house to hang out, to smoke weed and play cards and get ready

19    before going clubbing on South Beach and downtown.

20         I mean, he's that fellow in college that, you know,

21    that everybody would go to their house to get ready for the

22    party, and he's probably more guilty of being stupid and being

23    a friend than he is of this offense.

24         MR. DAVIDSON:  Your Honor, every orchestra has a

25    conductor and every conductor needs an orchestra; and if

 1    Mr. Dalmau was the conductor in this case, Ruddy Perez-Espinal

 2    and Octavio Delemos were the orchestra members, and each one

 3    of them was necessary for Dalmau to succeed and for the

 4    conspiracy to succeed.  And while it is true that their roles

 5    maybe less than Dalmau's, they were all necessary.

 6           Ruddy Perez-Espinal, Your Honor, was the star, I

 7    would say, the star cellist in this case.  He was necessary to

 8    go out and make the purchases.  He traveled across the United

 9    States to make purchases, and, therefore, no mitigating role

10    is required.

11           As for Octavio Delemos, Your Honor, we would agree

12    that his role is less than the other participants.  But that

13    doesn't mean that a reduction is warranted.

14           The guidelines provide that his role has to be

15    substantially less culpable than the average participant.  And

16    all three defendants in this case, Your Honor, possessed a

17    stolen credit card number and a fake ID, and that puts them at

18    par at that baseline.

19           Whether they exceeded that baseline in different

20    ways, it looks like Ruddy Perez-Espinal and Alfredo Dalmau did

21    more.  But fundamentally, Octavio Delemos was engaged in the

22    conspiracy, he played his role, and he doesn't deserve a

23    reduction either.

24           THE COURT:  Any other guideline calculations before

25    we move to the 3553 arguments?

1    MR. DAVIDSON:  Your Honor, I filed an objection on

2    the use of the means of identification, but I'll withdraw that

3    objection.

4         THE COURT:  All right.

5         MR. FLORES:  Judge --

6         THE COURT:  Mr. Flores.

7         MR. FLORES:  -- we filed an objection asking the

8    Court to consider awarding acceptance of responsibility.

9    We've cited all the cases that we were able to find from the

10   Eleventh Circuit reported, and it seems to me that this case

11   is different than those cases where the Eleventh Circuit has

12   decided that acceptance of responsibility was properly not

13   allowed.

14        THE COURT:  What's the difference?

15        MR. FLORES:  The guidelines say it has to be an

16   extraordinary case where we have both obstruction of justice

17   and acceptance of responsibility.  And in every case that I've

18   seen in the Eleventh Circuit, both reported and nonreported,

19   the Court has identified what is not worthy of acceptance of

20   responsibility under those circumstances.  They've never

21   identified what is worthy of those considerations.

22        In each of those cases, all that's been presented is

23   that the defendant pled guilty; therefore, he should get

24   acceptance of responsibility; or that the defendant pled

25   guilty early enough that he should get acceptance of

1    responsibility.

2          And, so, this case is distinguishable, because in

3    this case, as opposed to those cases analyzed by the Eleventh

4    Circuit, in this case we have two defendants who are

5    cooperating with the Government.  They've been debriefed as to

6    their involvement in this case.  They've given every detail

7    regarding this case.  They've given every detail regarding the

8    plan to flee and the carrying out of that plan.

9          They're cooperating in a state proceeding that is

10   related to this case.  They've been deposed by state court

11   defense counsel in that case.

12         So, those details, Your Honor, about cooperation

13   distinguish this case from those cases where acceptance of

14   responsibility has been rejected for someone who has

15   obstruction of justice also.

16         THE COURT:  But isn't this sort of a day late and a

17   dollar short?

18         MR. FLORES:  Your Honor, since I've gotten into this

19   case, Mr. Delemos has done everything in his power to correct

20   his stupid, stupid error of having gone along with the plan to

21   flee.

22         THE COURT:  I think there are three people -- myself,

23   Mr. Davidson and Mr. Martinez -- who are aware, at least from

24   this side, what this looks like.  We had -- Mr. Davidson and

25   Mr. Martinez, correct me if I'm wrong -- a suppression hearing

 1  that lasted three or four days.

 2          MR. DAVIDSON:  Correct, Your Honor.

 3          MR. MARTINEZ:  That's right.

 4          THE COURT:  The defendants knew that trial was going

 5  to start the following Monday.  We finished up early, I

 6  believe, on a Thursday or Friday.  We didn't start immediately

 7  because of jury considerations.

 8          They were told that they were supposed to be back in

 9  court and didn't show up; didn't comply with their Pretrial

10  Services officer's requirements, which is why the Pretrial

11  Services officer physically, as I recall, went to the

12  residence to verify this, thinking maybe foul play.  Well, she

13  wanted to be sure; physically went to the residence to

14  ascertain where they were.

15          Now, let's assume that the first part was a grave

16  error in judgment, disconnecting the electronic monitoring,

17  leaving the jurisdiction.

18          I don't recall, Mr. Davidson, where were their

19  passports?

20          MR. DAVIDSON:  I believe those were turned over to

21  Pretrial Services -- I apologize, the Secret Service had

22  them.

23          THE COURT:  Which meant they had to use some ruse,

24  falsification, et cetera, to leave the United States in the

25  first place.  So this wasn't like a spur of the moment.  This

1   required some thought.

2           And then, even after that part of the plan, they

3   don't voluntarily after they're gone say, you know, I made a

4   rash decision.  This was wrong.  I want to cooperate.

5           Nobody goes to a U.S. embassy.  Nobody calls either

6   of you -- at least I know Mr. Martinez was available to them

7   because he was their lawyer -- to say I made an error in

8   judgment; can you make arrangements for me to come back to the

9   United States so that I can either cooperate or go to trial,

10  as was their right.  That hadn't happen.

11          They were apprehended in another jurisdiction and

12  they were held till they were extradited back here, which cost

13  money and time and energy.  And now they want the largess of

14  the Court when they say they want to cooperate.

15          This is all cooperation that could have occurred two

16  years ago.  So that's why I said a day late and a dollar

17  short.

18          MR. FLORES:  Can I add one thing, Your Honor?

19          THE COURT:  You may.

20          MR. FLORES:  My understanding is there was a global

21  plea offer back in '08, and if all three defendants had

22  accepted that plea offer, Mr. Delemos would have received a

23  recommended sentence of probation and the other two defendants

24  would have received jail time.

25          That was unacceptable to Mr. Dalmau, and in the

1    debriefings we've learned that Dalmau arranged for a pilot to

2    fly them out of Opa-Locka Airport.  Dalmau arranged for false

3    documents to be provided upon arrival in the Dominican

4    Republic.  Dalmau made all of the expenses of the flight, and

5    he continues to elude capture in this case.  Mr. Delemos and

6    his family are doing what they can to help the Government find

7    him.

8            MR. MARTINEZ:  Judge, and on that point, if I can

9    just elaborate very briefly.

10           When I was representing all three defendants, which,

11   in hindsight, I don't have to say was probably a terrible

12   idea, but having said that, Octavio was offered probation and

13   Rudy was offered, I think, probably the equivalent of 18

14   months.  They were going to drop the 1028A, and Ruddy would

15   have to plead to some loss, but it didn't amount to a whole

16   lot in terms of time.

17           Alfredo Dalmau was offered the same thing.  He was

18   the holdout.  I pled with that guy time and time again, please

19   take this offer; we don't know what's going to happen with

20   this motion.  He was convinced that we were going to win the

21   motion.  I wasn't as convinced.  I mean, sometimes you win

22   things that you shouldn't win and you lose things that you

23   should win, and obviously, I told him, I mean, you cannot bank

24   on this -- you can't count on this, rather.

25           We know what happened in the end.  I mean, it was a

1    close motion and the Court ruled against the defendant.

2        But Ruddy also wanted to take the offer, and Dalmau,

3    he didn't want to take that offer, and the Government knew

4    this.  We had conversations about this, and some of these

5    conversations in fact took place in front of the defendants,

6    and they were privy to the threats -- not the threats that the

7    Government makes but, you know, the statements that they make

8    that, if you continue with this motion, this deal is off the

9    table and we're going to go to trial and you're likely going

10   to go to prison for a long time.  And I think that's what was

11   going on in their minds the whole time.

12       But just in terms of the desire of these two

13   gentlemen to plead, they wanted to plead.  Octavio, without

14   question, wanted to take a probationary plea.  Rudy--

15       THE COURT:  So what happened?  Why wait till you're

16   arrested?  Each step along the way where the folly of their

17   decision, okay, I left; okay, I'm now in the Dominican

18   Republic; any step along that way, they could have said, oh,

19   I'm no longer controlled by defendant number 3, who doesn't

20   happen to be here.  I need to start making my own decision,

21   being a man, and taking personal responsibility.  It doesn't

22   happen.

23       So, every time you -- okay, I didn't have the guts to

24   go against my buddy during the plea.  I didn't have the guts

25   to go against my buddy when he arranged for false documents

1    and an airplane.  I didn't have the guts to go against my

2    buddy when I got to the Dominican Republic.

3          At somewhere along the line you need to stand up and

4    take personal responsibility, and there are several steps

5    along the way where your clients could have done that.

6          I mean, I think the lesson of you representing all

7    three defendants was probably a lesson to the Court as well,

8    and Mr. Davidson has been nice enough to say to you and I

9    standing in open court, Judge, remember the Government was

10   against this.

11         MR. FLORES:  Your Honor is right.  Both of these guys

12   are young and were even younger in '08, and their lack of

13   maturity, I think, contributed to this problem.

14         MR. MARTINEZ:  Judge, I think the concern with the

15   acceptance is that they've done everything they possibly

16   humanly can after being caught, and there may be a Rule 35,

17   maybe.  I mean, they've been deposed on the state court case.

18   They've given the information as to the fellow who flew them

19   to Santo Domingo.

20         But, you know, these things, we're not sure that

21   they're going to get it.  I don't know that Mr. Davidson can

22   tell us definitively whether that's his intention.  I would

23   like to hear him in that regard.

24         But the concern is they've done all these things.

25   They've sat down and been deposed.  They've given details.

1          THE COURT:  Let me ask this question, because it has

2     not come up.

3          Mr. Davidson, are you agreeing with the probation

4     department not to give the two points for acceptance of

5     responsibility?

6          MR. DAVIDSON:  Your Honor, I do.

7          Nobody forced them on the plane.  While they've been

8     cooperating against the home invaders, that's something we can

9     take up later at a Rule 35 proceeding.

10          As far as, you know, not to go into Rule 11 or

11     privileged conversations between the defendants and their

12     attorneys, you know, if Mr. Delemos was the only one to show

13     up at trial on Monday and say, "Listen, my codefendants fled;

14     they asked me to join them, but I said no, I'm willing to come

15     before the Court," we'd be in a much different posture.  We

16     might reopen renegotiations on the plea and we wouldn't be

17     here where we are today.  It's very easy to cooperate when

18     you're next door and the prison guards are there watching over

19     you making sure you do the right thing.  That's a much

20     different circumstance, Your Honor.

21          So, I do agree that the acceptance, with Probation,

22     that there's nothing particularly extraordinary here.  And to

23     the extent that their cooperation leads to convictions, their

24     truthful testimony leads to convictions, we can take it up

25     then.

1      THE COURT:  All right.  Anything else before the

2   Court proceeds to sentencing?

3      I'll start with Mr. Delemos first, Mr. Flores.

4      MR. FLORES:  Your Honor, we presented a list of

5   reasons under 3553 why a less-than-guideline sentence would be

6   appropriate in this case.

7      First, Your Honor, we submitted an attachment.  He

8   was on the Dean's List and received a Bachelor's degree from

9   Florida International University.  When you combine that with

10  his lack of any criminal history, it would suggest that this

11  was an aberration on his part.

12     His conduct demonstrates that he had a lesser role

13  than his codefendants.  When viewed in combination with the

14  aberrant behavior, this would justify a less-than-guideline

15  sentence.

16     He was merely 24 years old when the offense was

17  committed.  His youth and his immaturity contributed to the

18  commission of the offense, and the Court should consider that

19  in determining what the appropriate sentence is.

20     Also, Your Honor, we submitted four letters of

21  reference.  The family actually gave me 35 letters of

22  reference, but I didn't want to burden the Court with having

23  to look at all of those.  They all very strongly object

24  Octavio Delemos, and that suggests that his support system

25  will aid in his rehabilitation and make unlikely any

1  recidivism in this case.  Those are matters that the Court can

2  consider.

3        The letters all talk about Octavio being a very

4  respectful and good citizen whose only fault was maybe being

5  too hospitable to his friends, in opening up his home to his

6  friends.  And ultimately, that's what got him into this case.

7        So, Your Honor, we'd ask the Court to consider all of

8  those factors in reaching a sentence that's fair, a sentence

9  that is below the guidelines as called for.

10        THE COURT:  Mr. Flores, does your client have

11  anything to say before I proceed to sentence?

12        MR. FLORES:  Your Honor, I've discussed his right to

13  allocute with him, and he feels emotionally unable to

14  communicate with the Court.

15        Hold on, Your Honor.

16        DEFENDANT DELEMOS:  I'd like to apologize to the

17  Government and the Court for all that's happened, especially

18  my family too, for all that they've had to go through, and

19  Your Honor as well.

20        MR. DAVIDSON:  May I, briefly, Your Honor?

21        THE COURT:  Mr. Davidson.

22        MR. DAVIDSON:  Your Honor, when considering the 3553

23  factors, Your Honor, just a few points.

24        First, this case involved over 3,000 victims.  That's

25  either a cruise ship full of victims, a football game full of

1    victims.  Thousands upon thousands of people were affected by

2    the defendant's conduct.

3         Regarding his role, Your Honor, while we agree it was

4    less, he was a necessary player here.

5         I would note that --

6         THE COURT:  Do you believe that he's less culpable

7    than the other two defendants?

8         MR. DAVIDSON:  I do.

9         I think, you know, providing your house and

10   possessing the fake credit card and ID is less offensive is

11   less than going out and actually making the purchases.  So, as

12   far as the scheme of things, I think Ruddy Perez-Espinal is

13   actually more culpable because he's actually making the

14   purchases on the stolen credit cards.

15        Your Honor, I would note that he seems to have the

16   support of family, and the fact that he decided to engage in

17   this conduct to commit credit card fraud, to flee the

18   jurisdiction, even though he had a family who would support

19   him, I think makes it even almost more offensive that he would

20   do that even though he had family that loved him and supported

21   him.

22        And finally, Your Honor, I would note that had the

23   Court accepted the Government's position on the number of

24   victims, their guideline range would have been 97 to 121.  Had

25   this Court accepted the Government's position, he could be

1    facing the statutory maximum of ten years.

2          And, so, I think that's a factor the Court can

3    consider.  Had they done this in 2010 instead of 2007, we

4    would be a 121 guideline maximum sentence.  And I think as far

5    as disparity across sentences, the Court can consider that

6    under 3553.

7          THE COURT:  Mr. Martinez, any further argument before

8    I proceed to sentence your client?

9          MR. MARTINEZ:  Yes, Your Honor.

10          I don't know that you know a whole lot about Rudy's

11    background, but before you stands a poor Dominican kid.  He

12    wasn't born with a silver spoon in his mouth.  He came from a

13    lower socioeconomic class family.

14          His mom and his dad divorced when he was two years

15    old, and he was raised by his father and stepmother, and they

16    formed their own family.  He was living with the father.  You

17    know, it was like he was an extra there, and he tells me this,

18    and I think it may have affected his self-esteem and may have

19    affected decisions that he's made in his life.  It's not to

20    make excuses for what he's done in this case -- there's no

21    excuse for it -- but it provides some understanding of who he

22    is.

23          And this courtroom is full of people.  None of them

24    are here for him.  He doesn't have a single person here.  His

25    father, evidently, has heart problems.  He couldn't fly down.

1    His mom works as a maid in New York City.  She doesn't have

2    the wherewithal to come down here.  He's worked at Fed Ex

3    carrying boxes.  He was flipping burgers, evidently, flipping

4    burgers when he was arrested in Santo Domingo.

5         You know, Alfredo Dalmau came to him and painted a

6    beautiful picture and said, look, you're going to hang out.

7    We're going to be like, you know, celebrities.  We're going to

8    wear nice jeans and cool glasses.  And he got caught up in a

9    world that he knew nothing about, that you see on TV, that

10   every day these young kids are being fed that that's your way

11   to happiness, if you're wearing cool jeans, cool glasses, and

12   you're wearing a nice watch.

13        That's not who he is, Judge.  I can tell you from

14   having represented him for a very long time, he's a good guy.

15   He's a good kid.  He's got a good heart.  He's very, very

16   smart.  But he lacks, I think, the self-confidence and self-

17   esteem that would have perhaps prevented him from doing this.

18        While he's been at the FDC, I think he's read at

19   least 15 books, books that friends and family have mailed to

20   him.  He's an avid reader.

21        He's very sorry for what he did, Judge.

22        THE COURT:  Mr. Martinez, let me ask this question,

23   and maybe it's the wrong one to ask.

24        You know, we live in Miami.  I think we all

25   understand that the lure of easy money and what people show on

1   TV about South Beach and the life that you live here can be

2   very seductive to people without the appropriate guidance.

3           Maybe Mr. Davidson or the probation officer can help

4   me out.

5           What would your client's sentence be that, if instead

6   of trying to steal from people who work, which is what he was

7   doing, he decided to sell crack to make his one million

8   dollars?  Do you have any idea what that sentence would be?

9   It would be like a telephone number.

10          MR. MARTINEZ:  Right.

11          THE COURT:  He'd be looking at a mandatory-minimum of

12   probably 120 months, possibly 240.

13          I just say that to illustrate that because you chose

14   the clean way to steal doesn't make you any less a criminal

15   than somebody who chooses a less antiseptic way to be a

16   criminal.

17          I mean, in some ways this is even worse, because

18   every person's number that they stole was a person who got up

19   every day and did what they didn't want to do.  They went to a

20   job.  They worked.  They saved.

21          I mean, I'm certain everybody here would love to say,

22   you know what, it would be great, let's hang out on South

23   Beach today, some drinks and let's not work.

24          But we all chose differently.  And I don't think your

25   client should get the benefit of not only being thieves but

1   being lazy thieves, because that's essentially what it is.

2          MR. MARTINEZ:  Judge, I agree with the Court in all

3   your statements.

4          All I can say is he was 22 years old when he

5   committed the offense.  It lasted a period of seven or eight

6   months, and he is extremely sorry for what he did.

7          I think that he knows he lost his way, and he

8   understands that God has placed him before this Court for a

9   reason, and there's a lesson to be learned here, and I suspect

10  that he's learned it.

11         And while he was hurting folks who had these credit

12  card numbers -- and I've had my credit card stolen, and it's a

13  terribly disconcerting thing -- you have to call the credit

14  card company, you have to cancel these cards -- but he was

15  injuring folks.  He was injuring the economy to some extent.

16  But he wasn't selling those drugs, that crack cocaine, that

17  the Court mentioned, you know, that really destroys lives.

18         There's no excuse for his behavior, Judge.  He knows

19  it.  I think he wants to address the Court and tell the Court

20  how he feels.

21         I think whatever the sentence is, Judge, there's no

22  winners here, not the Government.  You know, I don't know that

23  a sentence of any period of -- I'm asking the Court -- he's

24  got to serve two years anyway on the aggravated identity

25  theft.  That's a mandatory sentence.  And, so, the Court has

1    to determine what sentence to impose as a base upon which

2    you're going to give him the two years.

3         I'm asking the Court to give him a sentence of 18

4    months as that base in addition to the two years that he has

5    to serve as a mandatory sentence pursuant to the aggravated

6    identity theft.

7         I want to add also that while those numbers were

8    real, the ones that were used, the IDs that corresponded with

9    those numbers were not.  They were fictitious names that were

10   used on the IDs and that were placed on the credit cards when

11   the purchases were made.

12        And, so, it's not like they stole, you know, Percy

13   Martinez's name or credit card number.  They used, you know,

14   my ID or my information of an ID and went and bought

15   something.

16        THE COURT:  Well, it had to be a real card to work.

17        MR. MARTINEZ:  It was a real card, Judge.  But it

18   wasn't a real ID.  That's my point.

19        In some instances it's a real card and a real ID.

20   They use the same one as the name that appears on the card.

21        This wasn't that case.

22        Ruddy, would you like to say something?

23        DEFENDANT PEREZ-ESPINAL (through the interpreter):

24   Of course.

25        I wanted to ask forgiveness from the Court, from the

1    prosecution team, from the United States in general, as well

2    as all my family.

3            I never thought that in my intention of looking for a

4    better life I was going to make my family go through such an

5    unpleasant moment.

6            Regrettably, I have paid a very high price in order

7    to realize that this was not the best way, that this was the

8    wrong path.

9            I know that I made a very grave mistake, and that is

10   the reason why I want to ask forgiveness of all the people who

11   have been either directly or indirectly affected by all this.

12           And that is really all.

13           THE COURT:  As to defendant Ruddy Perez-Espinal, the

14   total offense level is 24.  The criminal history category is

15   one.  The advisory guideline range is 51 to 63 months on

16   Counts 1 and 2, and 24 months consecutive sentencing as to

17   Counts 5 through 7.

18           Since I do not think that the 3553 factors are met by

19   a sentence within the advisory guideline range, I will be

20   sentencing the defendant outside the advisory guideline

21   range.

22           The defendant is to be committed to the Bureau of

23   Prisons for a total of 64 months.  The total consists of 40

24   months as to Counts 1, 2 and 3 to be served concurrently, and

25   24 months as to Count 5, and 24 months as to Counts 6 and 7,

1    to be served consecutive to the count -- I've got to make sure

2    I have the numbers right.

3              Counts 1, 2 and 3:  The sentence is 40 months.

4              As to Counts 5 through 7:  It's 24 months to be

5    served consecutive to that sentence, for a total of 64

6    months.

7              THE PROBATION OFFICER:  And, Your Honor, I just

8    mention that Counts 6 and 7 and served concurrently with Count

9    5.  So it's a total of 24 months for those, not 24, 24 and

10   24.

11             THE COURT:  Those counts are also 1029(a), aggravated

12   identity theft counts?

13             THE PROBATION OFFICER:  Yes, Counts 5 through 7.

14             THE COURT:  Thank you.  The record should be clear on

15   that.

16             But the total sentence in this matter is 64 months as

17   to Mr. Perez-Espinal.

18             It is further ordered the defendant shall pay joint

19   and several restitution in the amount of $171,562.05.

20             During the period of incarceration payments shall be

21   made as follows:  If he earns wages in the UNICOR system, then

22   the defendant must pay 50 percent of his wages toward the

23   financial obligations imposed by this judgment.

24             If the defendant does not work in UNICOR, the

25   defendant must pay a minimum of $25 per quarter.

1      Upon release from incarceration, the defendant shall

2  pay restitution at the rate of ten percent of monthly gross

3  earnings until such time as the Court may alter the payment

4  schedule in the interest of justice.

5      The U.S. Bureau of Prisons, the U.S. Probation

6  office, and the U.S. Attorney's office shall monitor the

7  payment of restitution and report to the Court any material

8  change.

9      These payments do not preclude the Government from

10  using any other anticipated or unexpected financial gains,

11  assets or income of the defendant to satisfy the obligation.

12      All restitution payments be shall be made payable to

13  the Clerk of the Court.

14      Upon release from imprisonment the defendant shall be

15  placed on supervised release for a term of three years.  The

16  term consists of three years as to each of Counts 1, 2 and 3,

17  and one year as to Counts 5, 6 and 7, to run concurrently.

18      Within 72 hours of release from the custody of the

19  Bureau of Prisons the defendant shall report in person to the

20  probation office in the district where released.

21      While on supervised release, the defendant shall not

22  commit any crimes; shall be prohibited from possessing a

23  firearm or other dangerous device; shall not possess a

24  controlled substance; and shall comply with the standard

25  conditions of supervised release, including the following

1   special conditions:  Surrendering to Immigration for removal

2   after imprisonment; the financial disclosure requirement; the

3   no new debt restriction; and the self-employment restriction.

4   All are outlined more specifically in Part G of the

5   presentence report.

6          The defendant's right, title and interest to the

7   property identified in the preliminary order of forfeiture

8   which has been entered by the Court is incorporated here by

9   reference.

10         Now that sentence has been imposed, does the

11  defendant or his counsel object to the Court's findings of

12  fact or to the manner in which sentence was pronounced?

13         MR. MARTINEZ:  Judge, no; only to the extent that the

14  objections that I filed were not accepted by the Court.

15         THE COURT:  Sir, you have a right to appeal the

16  sentence imposed.  Any notice of appeal must be filed within

17  ten days.  If you are unable to pay the costs of an appeal,

18  you may apply for leave to appeal in forma pauperis.

19         Anything from the probation office?

20         THE PROBATION OFFICER:  Your Honor, did you mention

21  the special assessment?

22         THE COURT:  Excuse me.

23         The special assessment should be $600, as to each of

24  the counts $100.

25         Thank you.

1          As to defendant Octavio Delemos, the total offense

2    level is 24.   The criminal history category is one.   The

3    advisory guideline range is 51 to 63 months plus the 24 months

4    consecutive.

5          I find that the guideline range in this case does not

6    adequately reflect the factors in 3553 and I will be

7    sentencing this defendant outside the advisory guideline

8    range.

9          The defendant is committed to the Bureau of Prisons

10   for a total of 48 months.   The term consists of 48 months as

11   to each of Counts 1, 2 and 3 to be served concurrently; and 24

12   months as to Count 4, to be served consecutive to Counts 1, 2

13   and 3.

14         The defendant shall pay joint and several restitution

15   with the codefendants in the amount of $171,562.05.

16         During the period of incarceration payments shall be

17   made as follows:   If he works in UNICOR, 50 percent of the

18   wages toward the financial obligations imposed by the Court.

19   If he does not work in a UNICOR job while incarcerated, he

20   shall pay $25 per quarter.

21         Upon release from imprisonment, defendant shall pay

22   restitution at the amount of ten percent of monthly gross

23   earnings until such time as the Court may alter the payment

24   schedule.

25         The U.S. Bureau of Prisons, the Probation office, and

 1  the U.S. Attorney's office shall monitor the payment of

 2  restitution and report to the Court any material changes in

 3  the defendant's ability to pay.

 4         All payments shall be made to the U.S. Clerk's

 5  office.

 6         Upon release from imprisonment the defendant shall be

 7  placed on supervised release for a term of three years.  The

 8  term consists of three years as to Counts 1, 2 and 3, and one

 9  year as to Count 4, to run concurrently.

10         Within 72 hours of release from the Bureau of

11  Prisons, the defendant shall report to the probation office in

12  the district where released.

13         While on supervised release the defendant shall not

14  commit any crimes; shall be prohibited from possessing a

15  firearm or other dangerous device; shall not possess a

16  controlled substance; and shall comply with the standard

17  conditions of supervised release, including the following

18  special conditions:  Surrendering to Immigration for removal

19  after imprisonment; the financial disclosure requirement; the

20  no new debt restriction; and the self-employment restriction.

21  All are noted in Part G of the presentence report.

22         The defendant shall forfeit all right, title and

23  interest to the property, as was previously noted.

24         Now that sentence has been imposed, does the

25  defendant or his counsel object to the Court's findings of

1   fact or to the manner in which sentence was pronounced?

2           MR. FLORES:  Your Honor, we would object to the

3   Court's ruling on role in the offense and acceptance of

4   responsibility.

5           THE COURT:  Sir, you have a right to appeal the

6   sentence imposed.  Any notice of appeal must be filed within

7   ten days.

8           If I haven't done it, the $600 special assessment on

9   all six counts, $100.

10          THE PROBATION OFFICER:  The total imprisonment range

11  again, Your Honor?

12          THE COURT:  The total imprisonment range:  The total

13  amount is 48 months, 24 months as to Counts 1, 2 and 3; and

14  two years consecutive to those counts, Count 4.

15          THE PROBATION OFFICER:  Thank you, Your Honor.

16          MR. FLORES:  Your Honor, as to the special

17  assessment, Mr. Delemos was only charged in four counts that

18  he pled guilty to.

19          THE COURT:  I'm sorry.  I misspoke.

20          His special assessment amount is $400.

21          MR. DAVIDSON:  Your Honor, as this might be going up

22  to the Court of Appeals, could the record reflect that the

23  Government maintains its objection as far as the number of

24  victims and we believe that no variance or departure was

25  warranted in this case.

1          THE COURT:  Your objection is noted for the record,

2    Mr. Davidson.

3          Thank you very much.

4      *     *     *     *     *     *     *     *     *

5                  C E R T I F I C A T E

6

7      I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   March 12, 2010                    /s/ William G. Romanishin

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25